# Exhibit A

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Jing Chen
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
      jchen@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOLUKA GARMENT CO., LIMITED and HONGKUO TANG, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>CANAAN INC., NANGENG ZHANG, JIAXUAN LI, JIANPING KONG, QIFENG SUN, QUANFU HONG, CITIGROUP GLOBAL MARKETS INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, GALAXY DIGITAL ADVISORS LLC, HUATAI FINANCIAL HOLDINGS (HONG KONG) LIMITED, TIGER BROKERS (NZ) LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, and VIEWTRADE SECURITIES, INC.<br><br>    Defendants. | Case No: 1:20-cv-07139-JPO<br><br>~~CORRECTED~~[PROPOSED] SECOND **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

1

Lead Plaintiffs Boluka Garment Co., Limited and Hongkuo Tang ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Defendants' public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Defendants' conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of Canaan Inc. ("Canaan" or the "Company") American Depositary Shares ("ADSs")[1] from November 20, 2019 through February 20, 2020, inclusive (the "Class", and the period from November 20, 2019 through February 20, 2020 is the "Class Period").[2] Plaintiffs bring the following claims on behalf of the

---

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

[2] Excluded from the Class are: (a) persons who sold their shares prior to April 15, 2020; and (b) Defendants; the present and former officers and directors of Canaan at all relevant times; members

Class: (1) Section 11 and Section 15 claims under the Securities Act of 1933 (the "Securities Act") for all purchasers of Canaan ADSs pursuant or traceable to the Registration Statement and Prospectus in connection with Canaan's initial public offering (collectively the "Registration Statement") completed on or about November 20, 2019 (the "IPO" or "Offering"). The claims under §§11 and 15 of the Securities Act are non-fraud, strict liability claims against Lizhi, certain Lizhi officers and directors, the underwriters of the IPO, and Lizhi's U.S. representatives (collectively, the "Defendants"); and (2) Section 10(b) and Section 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of Canaan ADSs during the Class Period.

2.　　Though required by SEC regulations, U.S. Generally Accepted Accounting Principles ("GAAP"), and an SEC Staff Accounting Bulletin, the Registration Statement for Canaan's IPO – in which it raised $90 million – omitted to disclose several critical transactions and misstated the relationship between itself and one of its key executives. The Registration Statement identified Yongjie Yao as a holder of 8.8% of Canaan's shares – and only that. In fact, Yao was also the Chairman of Canaan's Board of Supervisors since 2017, a body that under Chinese law performs functions similar to a U.S. Board of Directors. It omitted, too, that Yao was one of Canaan's senior executives, responsible for all of its overseas sales. Finally, it omitted to disclose that Yao also controlled a company which had publicly announced an agreement to buy $150 million of blockchain equipment months before Canaan's IPO. Defendants' failure to disclose Canaan's multiple transactions with a man identified only as a principal shareholder rendered its Registration Statement misleading.

---

of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded ~~under this subsection (b),~~ herein, has or had a majority ownership interest at any time.

2.3.    Defendant Canaan, a company headquartered in China, ~~purportedly is~~purported to be the second largest designer and manufacturer of Bitcoin mining machines ~~globally in terms of computing power~~ in the first half of 2019~~. It went public on Nasdaq in November 2019.~~, the year of its IPO.

3.4.    ~~Before~~Between 2017 and 2019, Canaan ~~went public on the U.S. stock market, the Company failed repeatedly in its~~ made three unsuccessful attempts to ~~complete an IPO and~~ list its shares on ~~several~~ Asian stock exchanges.  ~~Canaan failed because those Asian exchanges did not approve of the Company's questionable business practices such as undisclosed related party transactions, inflated performance, suitability and dubious reserve-merger plan.~~ In two cases, the Exchanges required disclosure of related-party transactions that Canaan was reluctant to provide, or highlighted its unsavory business practices. The third exchange rejected Canaan's bid because it failed to meet its listing standards.

~~4.    When Canaan successfully sold US$90 million ADSs to U.S investors in its IPO on Nasdaq, U.S. investors did not know that Canaan's Registration Statement contained omissions of a similar nature that the various Asian stock exchanges previously disapproved of regarding related party transactions and inflating its performance.~~

~~5.    Particularly, the Registration Statement failed to disclose that at the time of IPO, Mr. Yongjie Yao ("Yao"), a principal shareholder of Canaan who held 8.8% of Canaan's total ordinary shares, also served as one of Canaan's senior executives in charge of the Company's international sales and marketing. He received salary and commissions for his performance as head of international sales at Canaan.~~

5.    ~~Also, on October 27, 2019, merely one~~ Professing that "going public is our primary goal" but having had no success with local markets, Canaan turned to the U.S. In November 2019,

Canaan sold $90 million of American Depositary Shares ("ADSs") in its Nasdaq IPO. But the Registration Statement with which it sold these ADSs omitted to disclose material related party transactions of the sort that had caused local exchanges to look askance or which Canaan had outright refused to disclose to them. Because SEC rules and guidelines and GAAP all required disclosure of the facts Canaan omitted, its Registration Statement was materially misleading.

6.   First, the Registration Statement disclosed that – and only that – Yao owned 8.8% of Canaan's shares. It omitted to disclose that Yao was a powerful Canaan executive. Yao chaired Canaan's Board of Supervisors since 2017, a body tasked by Chinese law with (among other things) overseeing Canaan's affairs, supervising Canaan's senior management, and putting forward proposals to remove senior executives. It also omitted to disclose that Yao was also himself a senior Canaan executive. Yao headed Canaan's international sales division, which already accounted for 20% of Canaan's total revenues as of the IPO and which Canaan planned to expand in the following years.

7.   Second, the Registration Statement omitted to disclose a material transaction with a company Yao controlled. The day before Canaan announced its ~~plan~~intention to ~~do an~~seek a U.S. IPO ~~on the U.S. stock market and filed its first draft of the Registration Statement~~, Grandshores Technology Group Limited~~, a company controlled by Yao,~~ ("Grandshores") announced ~~a strategic cooperation framework~~ that it had reached an agreement to ~~purchase from, or distribute on behalf of, Canaan blockchain~~buy up to $150 million of bitcoin mining equipment ~~worth up to US$150 million~~ from Canaan by December 31, 2020 ~~("Cooperation Agreement").[3] The value of this Cooperation Agreement was equal to 38% and 73% of Canaan's total net revenues for 2018 and~~

---

[3] ~~https://www1.hkexnews.hk/listedco/listconews/sehk/2019/1027/2019102700015.pdf, last viewed September 22, 2020.~~

2019 respectively and materially impacted investors' evaluation of the Company and . Yao owned 51% of Grandshores's shares and was therefore its controlling shareholder. He was also the Chairman of its Board and its Executive Director.

8.    Grandshores is listed on the Hong Kong Exchange. The Exchange's rules require disclosure of "material insider information" but preclude disclosure as such of transactions that consist only of "vague hopes" or where the negotiations lack "substantial commercial reality". Rather, companies should only disclose arrangements that "at a more concrete stage where the parties intend to negotiate with a realistic view to achieving an identifiable goal."  Yet on the day of the agreement, Grandshores disclosed the agreement as material nonpublic information, thus representing that the agreement was definite and material. Grandshores' investors thought it was material, too: the day after the disclosure, its stock price. However, opened up 65.1%.

6.9.    The agreement was also a big deal for Canaan. Canaan earned revenues of $177 million in the twelve months ending September 30, 2019. Yet the Registration Statement failed todid not disclose this agreement as a related party transaction and a known trend, event or uncertainty pursuant to SEC rules. Yao's contemporaneously holding senior positions at both Canaan and Grandshores also violated Canaan's Code of Business Conduct and Ethics, and further created a risk of self-dealing. , either.

7.    Furthermore, the Registration Statement failed to disclose that Zhejiang Suanli Network Science and Technology Company Ltd. ("Zhejiang Suanli"), a company that Defendants Kong and Sun exercised significant control over, had purchased RMB 973,333.33 (approximately US$149,697[4]) worth of products from Canaan in January through April 2017.

---

[4] Estimation is based on the Chinese Yuan Renminbi ("RMB") to US Dollars exchange rate for December 29, 2017 of 1 RMB equaling US$0.15380.

8.10.   On February 20, 2020, ~~a public company researcher~~analyst firm Marcus Aurelius published a report ~~entitled "~~on Canaan ~~Fodder"~~ (the "Marcus Aurelius Report~~") exposing~~"). The Marcus Aurelius Report exposed related party transactions between ~~Canaan and Yao, and Canaan and Defendant Kong. Immediately following publication of the Marcus Aurelius Report,~~Yao and Canaan. That day, the price of Canaan's ADSs fell $0.39 per ADS from their previous close, or over 6.8%, to close at $5.32 per ADSs ~~on February 20, 2020, damaging investors. By the time this action was filed, Canaan's stock price lost 48% of its value from the IPO price — devastating investors~~.

## II.    JURISDICTION AND VENUE

9.11.   The claims asserted herein arise under ~~and pursuant to~~ Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.12.  This Court has jurisdiction over the subject matter of this action ~~pursuant to~~under 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.13.  Venue is proper in this District ~~pursuant to~~under  28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Canaan ADSs on the Nasdaq, occurred in this District.

12.14.  In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including

but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.    PARTIES

13.15. Lead plaintiffPlaintiff Boluka Garment Co., Limited purchased Canaan ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

14.16. Lead Plaintiff Hongkuo Tang purchased Canaan ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

15.17. Defendant Canaan is incorporated in the Cayman Islands and its head office is located at 29 Jiefang East Road, Jianggan District, Hangzhou, 310016, People's Republic of China ("China"). Canaan's securities trade on Nasdaq under the ticker symbol "CAN."

16.18. Defendant Nangeng Zhang ("Zhang") has served as the Company's Chairman and Chief Executive Officer ("CEO") at all relevant times. Defendant Zhang signed or authorized the signing of the Registration Statement.

17.19. Defendant Jiaxuan Li ("Li") has served as a director of the Company at all relevant times. Defendant Li signed or authorized the signing of the Registration Statement.

18.20. Defendant Jianping Kong ("Kong") has served as a director of the Company at all relevant times. Defendant Kong signed or authorized the signing of the Registration Statement.

19.21. Defendant Qifeng Sun ("Sun") has served as a director of the Company at all relevant times. Defendant Sun signed or authorized the signing of the Registration Statement.

20.22.  Defendant Quanfu Hong ("Hong") has served as the Company's Vice President of Finance and Principal Financial and Accounting Officer at all relevant times. Defendant Hong signed or authorized the signing of the Registration Statement.

21.23.  Defendants Zhang, Li, Kong, Sun, and Hong are collectively referred to herein as the "Individual Defendants."

22.24.  Each of the Individual Defendants:

a.  signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Canaan investors, all motivated by their own and the Company's financial interests;

b.  directly participated in the management of the Company;

c.  was directly involved in the day-to-day operations of the Company at the highest levels;

d.  was privy to confidential proprietary information concerning the Company and its business and operations;

e.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

f.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

g.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

h.  approved or ratified these statements in violation of the federal securities laws.

23.25.  Canaan is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat* superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24.26.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Canaan under respondeat superior and agency principles.

25.27.  Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of Citigroup listed in the Registration Statement is 388 Greenwich Street, New York, New York 10013. Citigroup is registered with the SEC as a broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA").

26.28.  Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of China Renaissance Securities (Hong Kong) Limited is Units 8107-08, Level 81, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong. Pursuant to the Registration Statement, China Renaissance offered to sell the Canaan ADSs in the United States through its U.S.-based SEC-registered broker-dealer affiliate in the United States, China Renaissance Securities (US) Inc.

27.29.  Defendant CMB International Capital Limited ("CMB") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of CMB is 45F, Champion Tower, 3 Garden Road, Central, Hong Kong.

28.30.  Defendant Galaxy Digital Advisors LLC ("Galaxy") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of Galaxy Digital Advisors LLC is 107 Grand Street, New York, New York 10013. Galaxy is registered with the SEC as a broker-dealer and is a FINRA member.

29.31.  Defendant Huatai Financial Holdings (Hong Kong) Limited ("Huatai") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of Huatai Financial Holdings (Hong Kong) Limited is 62/F, The Center, 99 Queens Road Central, Hong Kong.

30.32.  Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers"), formerly known as Top Capital Partners Limited, is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. At the time of Canaan's IPO, Tiger Brokers had offices at Level 4, 142 Broadway, Newmarket, Auckland, 1023, New Zealand. Since January 7, 2020, Tiger Brokers' address has been updated to be Level 16, 191 Queen Street, Auckland Central, Auckland, 1010, New Zealand.

31.33.  Defendant Haitong International Securities Company Limited ("Haitong") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and

disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. Pursuant to the Registration Statement, Haitong offered to the ADSs in the U.S. through its SEC-registered broker-dealer affiliate in the U.S., Haitong International Securities (USA) Inc. The address of Haitong is 22/F, Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong.

32.34.  Defendant ViewTrade Securities, Inc. ("ViewTrade") is a financial services company that acted as an underwriter for Canaan's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Canaan securities issued pursuant thereto. The address of ViewTrade Securities, Inc. is 7280 W Palmetto Park Rd., #310, Boca Raton, FL 33433, United States. ViewTrade is registered with the SEC as a broker-dealer and is a FINRA member.

33.35.  Defendants Citigroup, China Renaissance, CMB, Galaxy, Huatai, Tiger Brokers, Haitong, and ViewTrade are collectively referred to hereinafter as the "Underwriter Defendants."

34.36.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement because:

      a.  The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively.

      b.  The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement.

c.  In addition, the Underwriter Defendants arranged roadshows prior to the IPO, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

d.  ~~Met~~The Underwriter Defendants met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

e.  ~~Representatives of the~~The Underwriters Defendants also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Canaan's most up-to-date operational and financial results and prospects. However, the Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misstatements or omissions.

f.  In addition to availing themselves of virtually unlimited access to internal corporate documents, the Underwriter Defendants and/or their agents, including

13

their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the IPO; (ii) the structure and terms of the IPO, including the price at which Canaan ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Canaan would be made in the Registration Statement; (v) what responses would be made to the SEC in connection with its review of the Registration Statement; and (vi) the establishment and maintenance of the underwriting and distributing networks. The Underwriter Defendants affected Canaan's IPO structure and terms, including the ~~ADSs~~ADSs' price, and the information about the IPO disclosed to the public. As a result of those constant contacts and communications between the Underwriter Defendants and Canaan's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable ~~case~~care should have known of, Canaan's existing problems as detailed herein.

g. The Underwriter Defendants also demanded and obtained an agreement from Canaan and the Individual Defendants that Canaan would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also ~~made certain~~required that Canaan ~~had purchased~~hold directors' and officers' liability insurance.

h. The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

35.37.  Defendants Canaan, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## IV.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### IV. 1. BITCOIN MINING AND
### a.    CANAAN'S PREVIOUS UNSUCCESSFUL IPO ATTEMPTS*Bitcoin Mining and Canaan's Previous Unsuccessful IPO Attempts*

36.38.  According to Bitcoin.org, a website originally registered and owned by Bitcoin's first two developers, Bitcoin is a consensus network that enables a new payment system and a completely digital money. It is the first decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen.[5]  Bitcoin's value has risen from about $300 per coin in 2014 to a peak of about $20,000 per coin in December 2017. At the time of Canaan's IPO on Nasdaq in November 2019, Bitcoin's price had dropped to about $7,000 per coin.[6]

37.39.  In sync with Bitcoin's rise in value, Defendants Zhang, Li, and Mr. Xiangfu Liu co-founded Canaan in 2013 and it grew quickly. Accordingpurported to be the Registration Statement, Canaan was theworld's second largest designer and manufacturer of Bitcoin mining machines globally (in terms of computing power sold in) for the six months ended June 30,first half of 2019. During the same period, when sales of its Bitcoin mining machines accounted for 21.9% of the combined computing power of all Bitcoin mining machines sold globally. The sales of Bitcoin mining machines, parts and accessories constitutedaccounted for 99.6%, 99.7% and 98.3% of the Company's revenues in 2017, 2018 and the first nine months of 2019, respectively.

---

[5] https://bitcoin.org/en/faq#general
[6] https://finance.yahoo.com/quote/BTC-USD?p=BTC-USD&.tsrc=fin-srch

38.40.  Before Canaan wentheld its IPO on Nasdaq in 2019, from 2016 to 2018, the Companyit had tried, unsuccessfully, three times to go public on various Asian stocklocal exchanges, and failed all three times.

39.41.  In 2016, it first attempted to get listed Canaan sought a listing on the Shenzhen Stock Exchange in China via a reverse merger. The Shenzhen Stock Exchange issued three inquiry letters[7], questioning.[8] It questioned, among other things, related party transactions and the legality of the deal.[9] Particularly, the Shenzhen Stock Exchange questioned the related party transactions between Canaan and Hangzhou Weitui Information and Technology Company Ltd ("Weitui"), a company of which Defendant Kong owned 90%.[10]  In 2015, Weitui purchased 95% of the computing equipment chip modules made by Canaan[11] and contributed approximately 87% of Canaan's operating revenues for 2015. These transactions involved the risk of self-dealing and inflation of Canaan's operating and financial performance. Weitui confirmed to the Shenzhen Stock Exchange that Weitui would continue its business in the Bitcoin blockchain industry. At the request of Shenzhen Stock Exchange,reverse merger. Defendants Zhang, Li and Kong were each

---

[7] http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?bc5fca76-6d92-4cf8-817f-2065ca9c71e8

[8]   http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?bc5fca76-6d92-4cf8-817f-2065ca9c71e8

[9] China prohibited a non-public company from going public via reverse merger with a public company under the disguise of the public company seeking financing for merger, acquisition and reorganization. See http://www.csrc.gov.cn/pub/newsite/ssgsjgb/ssbssgsjgfgzc/ywzx/201411/t20141102_262813.html

[10] Defendant Kong sold all his shares in Weitui to Defendant Sun in 2017.

[11] Based on the 3,895 blockchain computing equipment chip modules Weitui directly purchased from Canaan and 5,715 blockchain computing equipment chip modules Weitui purchased from GCI Science & Technology Co., Ltd. see http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?28bcebf8-86e8-4042-8420-969acd3e6f61; see also http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?a00b8bcd-5632-4539-b3ba-289c69893f6e

hadrequired to promise that they would try to avoid related party translations and would make proper disclosures regarding related party transactions if the deal waslisting were approved by the exchange.[12] With this cloud of suspicion cast on the deal by the Shenzhen Stock Exchange, Canaan abandoned its But they got cold feet and abandoned Canaan's IPO plan.[1314] Notably, in 2016, Weitui [15,16] Yet Canaan continued to purchase RMB 19,346,900 (approximately US$2.85 million) in blockchain products from Canaan, which constituted over 6% of Canaan's operating revenues in 2016engage in material transactions with the same related party that had raised the Shenzhen Stock Exchange's eyebrows.[17]

40.42.  The following yearIn 2017, Canaan sought to get listeda listing on the National Equities Exchange and Quotations in China ("NEEQ").[18] This time, it had to abandon itsYet Canaan again abandoned its listing plan again after four rounds of questioning by NEEQ.[19] Notably, Canaan disclosed that Zhejiang Suanli Network Science and Technology Company Ltd. ("Zhejiang Suanli"), a company that  Defendant Kong owned 10% of, and exercised significant control over, had purchased RMB 973,333.33 (approximately US$149,697) worth of products

---

[12]    http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?28bcebf8-86c8-4042-8420-969acd3e6f61

[13] https://36kr.com/p/1723125776385, last viewed September 22, 2020.

[14] http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?bc5fca76-6d92-4cf8-817f-2065ca9c71e8

[15] https://36kr.com/p/1723125776385, last viewed September 22, 2020.

[16]    http://www.szse.cn/disclosure/listed/bulletinDetail/index.html?bc5fca76-6d92-4cf8-817f-2065ca9c71e8

[17] http://www.neeq.com.cn/disclosure/2017/2017-11-02/1509607893_727149.pdf, at p. 88.

[18] NEEQ, also known as the New Third Board, is the third largest national equity trading venue after Shanghai Stock Exchange and Shenzhen Stock Exchange in China. http://www.neeq.com.cn/en/about_neeq/introduction.html

[19] http://www.neeq.com.cn/disclosure/2017/2017-11-02/1509607893_727149.pdf; http://www.neeq.com.cn/disclosure/2017/2017-11-22/1511340005_423724.pdf; http://www.neeq.com.cn/disclosure/2018/2018-03-01/1519889833_580997.pdf; http://www.neeq.com.cn/disclosure/2019/2019-04-22/1555930926_930369.pdf.

from Canaan in January through April 2017.[20] ~~NEEQ's inquiries show that NEEQ was particularly concerned about the~~ questions by the NEED focused on the necessity ~~or~~, business purpose, and fairness of ~~such~~certain related party ~~transitions~~transactions Canaan engaged in.[21, 22]

41.43.   ~~After the Chinese domestic stock market's repeated disapproval of Canaan's IPO~~With two unsuccessful attempts on Mainland China exchanges, Canaan ~~tested its luck~~sought a listing on the Hong Kong Stock Exchange ("~~HKSE~~HKEX") in 2018.   ~~Canaan let its application lapse because the Company failed to meet the HKSE's listing standards. HKSE~~But, as HKEX CEO Charles Li later explained ~~that HKSE~~, the HKEX had doubts about Canaan' profit sustainability because of ~~PRC~~ regulatory uncertainties regarding the blockchain business.~~[23]~~ in China.[24] Canaan let its application lapse.

42.44.   ~~Upon Canaan's failure~~Having failed to ~~go public~~list in Shenzhen, on the ~~HKSE~~NEEQ, or in Hong Kong, Mr. Feng Chen, Sales Director of Canaan ~~explicitly~~ confirmed ~~to the media~~ that Canaan was still trying to complete an IPO because "going public is our primary goal".[25]

43.45.   ~~After many failed attempts in the Asian market~~Having exhausted domestic markets, Canaan ~~set its eyes on~~turned to the U.S. ~~capital market.~~

[20] ~~http://www.neeq.com.cn/disclosure/2017/2017_08_30/1504079249_162780.pdf~~

[21] http://www.neeq.com.cn/disclosure/2017/2017-11-02/1509607893_727149.pdf~~, at pp. 88, 89, 128; http://www.neeq.com.cn/disclosure/2017/2017-11-22/1511340005_423724.pdf; http://www.neeq.com.cn/disclosure/2018/2018-03-01/1519889833_580997.pdf; http://www.neeq.com.cn/disclosure/2019/2019-04-22/1555930926_930369.pdf.~~

[22] http://www.neeq.com.cn/disclosure/2017/2017-11-02/1509607893_727149.pdf, at pp. 88, 89, 128

[23] ~~https://www.yicaiglobal.com/news/crypto-mining-rig-makers-lack-uitability-to-ipo-in-hong-kong-exchange-ceo-says, last viewed September 22, 2020.~~

[24]   https://www.yicaiglobal.com/news/crypto-mining-rig-makers-lack-uitability-to-ipo-in-hong-kong-exchange-ceo-says, last viewed September 22, 2020.

[25] https://www.chaindd.com/3162720.html

44.46.  On October 28, 2019, Canaan filed a registration statement on Form F-1 with the SEC for the sale ofto sell its ADSs in connection with its planned IPO ona Nasdaq IPO.

45.47.  As shown in the "Timeline and Responsibility Chart" for a foreign private issuer's IPO (attached hereto as Exhibit 1[26]), throughout the entire),[27] IPO process, all participants in the IPO,  including the issuer and its local and U.S. counsels, the underwriters and non-U.S. managers and their local and U.S. counsels, and auditors – conduct, or at any rate are expected to conduct, extensive and intensive due diligence onconcerning the issuer's legal, financial, business and accounting aspects, to ensure that the registration statement contains no material omissions or misstatements. During the due diligence investigation, the issuer's counsel will requestrequests and review an extensive reservoirreviews a substantial library of corporate documents.[28] The issuer, underwriters', and auditors will interview officers, directors, other relevant employees, customers and suppliers, among others, to ensure that all relevant and potentially material information is evaluated and considered for disclosure in the Registration Statement.

46.48.  Canaan's IPO was a "firm-commitment" underwritingoffering, meaning that the Underwriter Defendants purchased Canaan ADSs from Canaan and then the Underwriter Defendants sold the ADSsresold them to the public. In a firm-commitment underwriting, the underwriters take legal title to the shares and therefore take on substantial risk if they are unable to resell the shares to investors in the IPO.

---

[26] Also available at https://www.pillsburylaw.com/images/content/1/0/v2/104475/securitiespocketbook.pdf, at p. 83
[27] Also available at https://www.pillsburylaw.com/images/content/1/0/v2/104475/securitiespocketbook.pdf, at p. 83
[28] See a sample due diligence request list sent to the company. http://www2.law.columbia.edu/course_00S_L9436_001/2005/DDIPO.pdf

47.49. Pursuant to the Underwriting Agreement, which was part of the Registration Statement, Defendant Citigroup acted as the lead underwriter for all Underwriter Defendants in connection with the transactions contemplated by the Underwriting Agreement, and any action under the Underwriting Agreement taken by Citigroup was binding upon all the Underwriter Defendants. Defendants Citigroup, China Renaissance and CMB led the listing of Canaan.[29]

48.50. The Underwriter Defendants had severally and not jointly agreed to purchase from Canaan the number of ADSs indicated below.

| Underwriter | Number of ADSs |
| --- | --- |
| Citigroup Global Markets Inc. | 5,434,784 |
| China Renaissance Securities (Hong Kong) Limited | 2,536,232 |
| CMB International Capital Limited | 1,026,570 |
| Galaxy Digital Advisors LLC | 60,386 |
| Huatai Financial Holdings (Hong Kong) Limited | 60,386 |
| Tiger Brokers (NZ) Limited | 785,024 |
| Haitong International Securities Company Limited | 12,077 |
| ViewTrade Securities, Inc. | 84,541 |
| Total | 10,000,000 |

---

[29] "Bitcoin Firm Canaan Loses Credit Suisse as Lead in Smaller IPO", dated November 14, 2019, https://www.bloomberg.com/news/articles/2019-11-14/bitcoin-firm-canaan-loses-credit-suisse-as-lead-in-smaller-ipo

49.51.  Canaan commenced its road show activitiesshows on or about November 13, 2019.[30] Roadshows are marketing campaigns conducted for an issuer's IPO. In a road show, representatives of the underwriters, together with senior managers of the issuer, present the issuer to prospective investors and analysts, and receive informal bids for securities offered in the IPO. This method, common around the world and necessary to complete the IPO, usesencourages two-way information flow. On one hand, itWhile a road show provides information about the issuer for prospective investors and on the other, it also provides the underwriters and issuers with pricing information for the underwriters through testing investor appetite for the securities to be offered in the IPO.

52.    AAn English-language road show presentation in English distributed to investors in November 2019[31] shows that Citigroup, China Renaissance, Galaxy, Huatai, CMB, Tiger Brokers and Haitong participated in investor roadshows promoting Canaan's IPO. In mid-November 2019, a roadshow was conducted at NASDAQ. [32] The promotion was so successful that the total number of shares that investors

50.53. Investors subscribed for wasto purchase three times greater than the actual number of theas many Canaan ADSs that the Underwriter Defendants offered for sale within just one day afterof when the Underwriter Defendants began accepting subscriptions.[33]

---

[30] https://sec.report/Document/0001193125-19-291130/
[31] https://www.leinews.com/n10029/detail.html
[32] https://hb.dzwww.com/p/4026679.html
[33] *Id.*

51.54.  On November 18, 2019, Canaan and the Underwriter Defendants separately filed requests with the SEC for acceleration ofto accelerate the effective date of the Registration Statement. The SEC declared the Registration Statement effective on November 20, 2019.

52.55.  On November 20, 2019, Canaan filed its final amendment to the Registration Statement, which. Canaan registered 10 million Canaan ADSs for public sale. Each ADS represented fifteen Class A ordinary shares. The ADSs were issued pursuant to the Deposit Agreement among Canaan, The Bank of New York Mellon, as the depositary, and the owners and holders from time to time of the ADSs issued under the Deposit Agreement. The Bank of New York Mellon administered its depositary receipts business from its offices located at 240 Greenwich Street, New York, New York 10286.

53.56.  On November 21, 2019, Defendants priced the IPO at $9 per ADS and filed the final Prospectus for the IPO on Form 424B4, which forms part of the Registration Statement.

### IV.2. FAILURE TO DISCLOSE YONGJIE YAO'S SENIOR EXECUTIVE ROLE AND WORK AT CANAAN

54.1.    The Registration Statement disclosed that Yao was a principal shareholder of Canaan, holding 8.8% of Canaan's total ordinary shares at the time of the IPO and 8.2% of Canaan's total ordinary shares and 2.6% voting power immediately after the IPO. However, the Registration Statement failed to disclose that Yao was the Chairman of the Board of Supervisors of Canaan, and also a senior executive at Canaan in charge of international sales of Canaan products and receiving salaries and commissions for his performance at Canaan. According to a registration statement that Canaan filed with the NEEQ in China in August 2017, Yao was elected to be Chairman of the Board of Supervisors of Canaan in July 2017.[34] Under Chinese corporate

---

[34] http://www.neeq.com.cn/disclosure/2017/2017-08-30/1504079249_162780.pdf, at 195, 223.

law, a supervisor[35] is a top-level executive, that closely oversees and directs a company's business. Supervisors serve on a board of supervisors with rights similar to directors. According to the Company Law of the People's Republic of China (2018 Amendment), supervisors' powers include, *inter alia*,

- Overseeing the financial affairs of the company,

- Supervising the conduct of directors and senior managers while discharging their corporate responsibilities,

- Putting forward proposals on the removal of any director or senior manager who violates any law, administrative regulation, bylaw or any resolution of the shareholders; and demanding any director or senior manager to make corrections if his act has injured the interests of the company;

- proposing to call interim shareholders' meetings,

- calling and presiding over shareholders' meetings when the board of directors does not exercise the function of calling and presiding over shareholders' meetings as prescribed in this Law;

- putting forward proposals at shareholders' meetings;

- at the request of shareholders, sue a director or senior manager if he violated the law or regulations and damaged the company.

55.    A fuller description of the rights and obligations of supervisors is attached as Exhibit 2.

---

[35] According to Article 51 of the Company Law of China, a limited liability company shall have a board of supervisors of no fewer than three members. A limited liability company with a small number of shareholders or a small scale may have one to two supervisors instead of a board of supervisors.

56. ~~Article 21 of the Company Law of China provides that the controlling shareholder, de facto controller, directors, supervisors and senior officers of a company may not use their positions to harm the interests of the company.  This shows that the high level and importance of the role of Supervisor is similar to that of directors, senior officers and control persons.~~

57.1. ~~Plaintiffs' witness 1 ("Witness 1") was a senior quality manager at the quality management department of Beijing Canaan Creative Information Technology Co., Ltd. ("Beijing Canaan") from December 2015 through December 2017.~~ ~~He told Plaintiffs' investigator that "Yongjie Yao was based in Hangzhou, not in Beijing." "In fact, it is the same department whether you are in Beijing or Hangzhou. It is the Sales Department." "I know that he worked at the Sales Department". "Yao was a salesperson. The primary portion of his salary was from commissions, unlike us conducting quality. We relied on fixed salaries." "Yao was an employee." When Plaintiffs' investigator asked Witness 1 if Yao was responsible for international sales, primarily Europe and America, Witness 1 said "Yes".~~ ~~When asked for examples of Yao's sales targets, Witness 1 stated that "primarily the U.S., Germany, U.K.", "and some other European and American countries too".~~

58. ~~Plaintiffs' witness 2 ("Witness 2") was a business associate at the Business Department of Hangzhou Canaan Creative Information Technology Co., Ltd., Canaan's main business operation in China ("Hangzhou Canaan"), from June 2019 through July 2019.~~ ~~His job responsibilities included establishing contracting procedures, keeping books of account, organizing clients' information and maintenance.~~ ~~When Plaintiffs' investigator asked Witness 2 whether he knew Yao, Witness 2 stated that "Yongjie Yao is an executive." When asked if Yao went into the office on a daily basis, Witness 2 stated "Yao was responsible for the outside". When asked to clarify the meaning of "outside", Witness 2 stated that "sales to the overseas". When~~

24

Plaintiffs' investigator asked to clarify if Yao's sales responsibilities related to sales of Canaan bitcoin mining machines in overseas markets, Witness 2 stated "you can say that."

**b.  _SEC Guidance and Regulations, and GAAP Required Disclosure of Material Related Party Transactions_**

59.57.  Item 404 of SEC Regulation S-K (27 CFR § 229.404)), "Transactions with Related Persons, Promoters and Certain Control Persons" requires a public company to "describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

60.58.  A "related person" is defined by Reg. Regulation S-K as includingto include any director or executive officer of the Company, any immediate family member of a director or executive officerand any person holding 5% or more of the Company, any immediate family member of any 5% or greater shareholder of the Company. Company's sharesSee Instruction to Items 404 (a).1 and 403(a) (27 CFR § 229.403).

61.59. SEC Regulation S-K defines a transaction, for purposes of related party transactions, to include, but is not limited to, without limitation "**_any financial transaction, arrangement or relationship_** (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships.." Instruction to Item 404 (a).2.

60.     SEC Regulation S-K (27 CFR 229.10) mandates that on Forms F-1, like Canaan's Registration Statement,  companies must comply with the other disclosure requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10. Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

25

61.    Under Item 7.B. ~~Under Item 7.B.~~ "related party transactions" of SEC Form 20-F, a requirement applicable to Canaan's IPO, requires disclosure of ~~"the information required below for the period since the beginning of the company's preceding~~ , for the three ~~financial~~ years[36] up to the date of the document~~, with respect to~~ :

~~62.~~    transactions or loans between the company and ~~(a) enterprises that directly, or indirectly through one or more intermediaries, control, or are controlled by, or are under common control with, the company; (b) associates;~~… (c) individuals owning, directly or indirectly, ***an interest in the voting power of the company that gives them significant influence over the company***, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the company, ***including directors and senior management of companies*** and close members of such individuals' families~~; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence. This includes enterprises owned by directors or major shareholders of the company and enterprises that have a member of key management in common with the company. Close members of an individual's family are those that may be expected to influence, or be influenced by, that person in their dealings with the company. An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company.~~ … Significant influence over an enterprise is the power to participate in the financial and operating policy decisions of the enterprise but is less than control over those policies. Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company~~."~~.

62.    Form 20-F, Item 7.A.1, *Major Shareholders and Related Party Transactions*, defines major shareholders as "shareholders that are the beneficial owners of 5% or more of each class of the company's voting securities".

63.    Under SEC regulations, Canaan must disclose "[t]he nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services,

---

[36] ~~An emerging growth company may conduct its initial public equity offering using two years, rather than three years, of audited financial statements and as few as two years, rather than five years, of selected financial data.~~

or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party." Form 20-F, Item 7.B 1.

SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (1999) (hereinafter "SAB No. 99") provides that as to the analysis of materiality: "[Q]uantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations." SAB No. 99 highlights as potentially material misstatements about "a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."

64.    Regulation S-X, 50 Fed.Reg. 49,529–02, at 49,530 n. 3 (Dec. "[I]in3, 1985), also requires disclosure: "[I]n some cases[,] the significance of an item may be independent of the amount involved. For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately even though the dollar amounts involved are relatively small." Financial Statements and Regulation S-X, 50 Fed.Reg. 49,529-02, at 49,530 n. 3 (Dec. 3, 1985) (SEC explanation of rules)

65.    The consolidated financial statements contained in Canaan's Registration Statement were required to be prepared and presented in accordance with the U.S. Generally Accepted Accounting Principles ("GAAP").GAAP.

66.    The SEC has the statutory authority for the promulgation ofto promulgate GAAP for public companies and has delegated that authority to the U.S. Financial Accounting Standards Board ("FASB"). See Release Nos. 33-8221; 34-47743; IC-26028; FR-70. The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.

67.	SEC and NASDAQ rules and regulations require that publicly traded companies such as Canaan include financial statements that comply with GAAP in their annual and quarterly reports, and registration statements filed with the SEC.

68.	SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

69.	Management is responsible for preparing financial statements that conform to GAAP. The , as provided in the Public Company Accounting Oversight Board standards that govern financial statement auditors ("PCAOB Standards provide:"):

> The financial statements are management's responsibility…. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. AS 1001.03

70.	GAAP requires, too, required disclosure of all material transactions between Canaan and related parties. ASC 850-10-50-1.

71.	ASC 850, Related Parties, establishes requirements for disclosure of material transactions between a company and related parties, such aslike its officers and directors. A copy of ASC 850 is attached hereto as Exhibit 32 and is incorporated by reference herein.

72.	Under ASC 850, related parties include, *inter alia*:

d. Principal owners of the entity and members of their immediate families
e. Management of the entity and members of their immediate families

28

f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests

g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. ASC 850-10-20. 73.   The disclosures shall include:

73.   ASC 850 requires disclosure of:

a. The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

74.   FASB specifically points out provides that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms

29

equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated."." ASC 850-10-50-5.

Defendants violated the SEC regulations and GAAP for failing to disclose the related party Under FAS No. 57, transactions between Yao and related parties should be disclosed even if services are rendered to the corporation by the related party without charge or no amounts or nominal amounts are ascribed. FAS No. 57 pg. 4-5. Disclosure of all related party transactions is important for investors to determine whether the corporation has subordinated its independent interests to the related party. FAS No. 57, p.7.

c. *Failure to Disclose Yongjie Yao's Senior Executive Role and Work At Canaan*

75. The , namely Yao working as an executiveRegistration Statement disclosed that, and only that, Yao was a principal shareholder of Canaan, holding 8.8% of Canaan's total ordinary shares at the time of the IPO and 8.2% of Canaan's total ordinary shares immediately after the IPO. The Registration Statement acknowledged that principal shareholders exercised significant influence on the Company. See Registration Statement at 31 ("[Canaan's] corporate actions are significantly influenced by [its] principal shareholders … who have the ability to exert significant influence over important corporate matters that require approval of shareholders while their interests may differ from those of the other shareholders".). Indeed, Canaan disclosed in its registration statement filed with the NEEQ in China in August 2017 that Mr. Yao was a "key related party" because he was a supervisor.

76. The Registration Statement *failed* to disclose that Yao was the Chairman of the Board of Supervisors of Canaan.

77.    According to a registration statement that Canaan filed with the NEEQ in China in August 2017, Yao was elected to be Chairman of the Board of Supervisors of Canaan in July 2017.[37]

78.    Under Chinese corporate law, a supervisor[38] is a top-level executive, that closely oversees and directs a company's business. Supervisors serve on a board of supervisors with rights similar to directors. According to the Company Law of the People's Republic of China (2018 Amendment), supervisors' powers include, *inter alia*,

- o  Overseeing the financial affairs of the company,

- o  Supervising the conduct of directors and senior managers while discharging their corporate responsibilities,

- o  Putting forward proposals on the removal of any director or senior manager who violates any law, administrative regulation, bylaw or any resolution of the shareholders; and demanding any director or senior manager to make corrections if his act has injured the interests of the company;

- o  proposing to call interim shareholders' meetings,

- o  calling and presiding over shareholders' meetings when the board of directors does not exercise the function of calling and presiding over shareholders' meetings as prescribed in this Law;

- o  putting forward proposals at shareholders' meetings;

---

[37] http://www.neeq.com.cn/disclosure/2017/2017-08-30/1504079249_162780.pdf, at 195, 223.
[38] According to Article 51 of the Company Law of China, a limited liability company shall have a board of supervisors of no fewer than three members. A limited liability company with a small number of shareholders or a small scale may have one to two supervisors instead of a board of supervisors.

     o   at the request of shareholders, sue a director or senior manager if he violated the law or regulations and damaged the company.

79. A fuller description of the rights and obligations of supervisors is attached as Exhibit 3.

80. Article 21 of the Company Law of China lists Supervisors alongside controlling shareholders, de facto controllers, directors, and senior officers, as persons who may not use their position of control to harm the interests of the company, thereby showing that just like senior officers, directors, de facto controllers, and shareholders, supervisors are in fact controlling persons.

81. Yao also served as a senior Canaan executive. In 2017, 2018 and the nine months ended September 30, 2019, revenues from international sales accounted for 8.5%, 23.9% and 20.2% of Canaan's total revenue respectively. *See* Registration Statement at 19. Yao headed Canaan's international sales division.

82. Plaintiffs' witness 1 ("Witness 1") was a senior quality manager at the quality management department of Beijing Canaan Creative Information Technology Co., Ltd. ("Beijing Canaan") from December 2015 through December 2017. Witness 1 told Plaintiffs' investigator that Yao worked in Hangzhou, where Canaan's principal executive offices are based. Witness 1 stated that "Yao was an employee." Witness 1 agreed that Yao was responsible for Canaan's international sales. Witness 1 told Plaintiffs' investigator that Yao's primary compensation was a percentage of sales. When asked for examples of Yao's sales targets, Witness 1 stated that "primarily the U.S., Germany, U.K.", "and some other European and American countries too".

83. Plaintiffs' witness 2 ("Witness 2") was a business associate at the Business Department of Hangzhou Canaan Creative Information Technology Co., Ltd., Canaan's main

operating subsidiary in China ("Hangzhou Canaan"), from June 2019 through July 2019. His job responsibilities included establishing contracting procedures, keeping books of account, organizing clients' information and maintenance. Witness 2 told Plaintiffs' investigator that Yao was "an executive" at Canaan who was "responsible for" "sales to overseas."

84.     Beyond their importance to current revenues, Canaan was striving to expand its international sales and represented the significance of international sales to Canaan's future profitability. Indeed, the Registration Statement represented that Canaan's goals included:

> *Continue to expand our overseas operations.*
> We plan to further diversify our business geographically as well as explore new markets globally. To achieve this, we plan to establish overseas offices in Singapore, Japan, the United States and Israel to facilitate local marketing campaigns so as to enhance our overseas exposure and expand our overseas customer base. We also plan to recruit talent for research and development, investment, and sales for our overseas offices. We intend to increase our international sales team to meet the increased demand from overseas markets. We also intend to pursue strategic overseas investment opportunities, such as identifying and acquiring suitable companies that would help us reach our expansion goals." (Registration Statement 116.)

85.     Canaan was required to disclose material related party transactions from 2017 through its November 2019 IPO. But Canaan failed to disclose that Yao had served as the Chairman of the Board of Supervisors of Canaan since 2017 and the senior executive in charge of sales.

75.86.  Defendants violated the SEC regulations and GAAP by failing to disclose in the Registration statement the related party transactions between Yao and Canaan in 2017, 2018 and 2019, namely Yao's work as a Canaan executive and his role as the Chairman of its Board of Supervisors.

76.87. Had the Defendants properly conducted due diligence during the IPO such as interviewing the Company's directors, officers or relevant employees, they would undoubtedly have learned that Yao was the senior-most sales executive in charge of the Company's

33

international sales, the fastest growing segment of Canaan's business, who contemporaneously held a senior position at Grandshores as discussed below.

IV.3. FAILURE TO DISCLOSE THE COOPERATION AGREEMENT BETWEEN CANAAN AND GRANDSHORES

### d.  Failure to Disclose the Cooperation Agreement Between Canaan and Grandshores

SEC Rules Require Disclosure Of Related Party Transactions
That Are Material To the Related Party

88.    Item 404 of SEC Regulation S-K (27 CFR § 229.404) requires Canaan to disclose "any currently proposed transaction, in which [Canaan] was or is to be a participant and the amount involved exceeds $120,000, and in which **ANY** related person had or will have a direct or indirect material interest."

89.    SEC Form 20-F, a form applicable to Canaan's IPO, also requires disclosure of "presently proposed transactions which are material to the company **OR** the related party." Form 20-F, Item 7.B 1. SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (1999).

*Grandshores Was A Related Party to Canaan*

90.    On October 27, 2019, one day before Canaan's announcement of its planned IPO on Nasdaq and filing of the Registration Statement, Grandshores announced the Cooperation Agreement entered between one of its subsidiaries, Hangzhou Grandshores Weicheng Technology Co., Ltd. ("Grandshores Weicheng"), and Canaan.

91.    The Cooperation Agreement stated that "GS Weicheng intend[ed] to purchase from Canaan or distribute on behalf of Canaan blockchain equipment with an aggregate amount of not more than USD150 million up to 31 December 2020. Canaan will provide GS Weicheng with preferential prices and technical guidance." 10)The potential revenue the Cooperation Agreement could bring to Canaan in the year after the IPO nearly equaled Canaan's entire trailing twelve-

34

month revenues of approximately $177 million, and amounted to 38% and 73% of Canaan's total net revenues for 2018 and 2019.

92.    In addition to his roles at Canaan, Yao owned 51% of Grandshores and was its Chairman of the Board and Executive Director of Grandshores. As a result, Grandshores was a related party to Canaan.

The Cooperation Agreement Was A Material Transaction to Grandshores

93.    Grandshores was and still is a public company listed on the HKEX. Upon the entry of the Cooperation Agreement, Grandshores immediately disclosed it as material inside information pursuant to Hong Kong law and HKEX rules.

94.    HKEX is the world's largest securities market in terms of market capitalization. Having a history of 130 years, HKEX is regulated by various complicated laws and regulations vastly similar to those in the U.S. Pursuant to Part XIVA of the Hong Kong Securities and Futures Ordinance ("SFO"), a HKEX-listed company must immediately disclose price sensitive information, i.e. inside information, defined as  "specific information that is about the listed company … and is not generally known to the persons who are accustomed or would be likely to deal in the listed securities of the corporation but would if generally known to them be likely to *materially* affect the price of the listed securities". SFO 307A.

95.    The Securities and Futures Commission ("SFC") of Hong Kong, the Hong Kong equivalent of the U.S. Securities Exchange Commission, is responsible for setting and enforcing market regulations and regulating market misconduct on HKEX. It issued *The Guidelines on Disclosure of Inside Information* ("Guidelines"), further detailing a HKEX-listed company's duties to disclose under SFO 307A. The Guidelines provide that issuers should *not* disclose transactions that are mere "vague hopes" or "wishful thinking".  Instead, issuers should only

35

disclose transactions where there is "a substantial commercial reality to [] negotiations which goes beyond a merely exploratory testing of the waters and which is at a more concrete stage where the parties intend to negotiate with a realistic view to achieving an identifiable goal."

96.    The Guidelines read, in relevant part:

"Information on a transaction **contemplated or at a preliminary state of negotiation** can be specific information but vague hopes and wishful thinking may not be specific information. **The fact that a transaction is only contemplated or under negotiation and has not yet been subjected to any formal or informal final agreement does not necessarily cause the information concerning that contemplated course of action or negotiation to be non-specific**. However, a vague hope or wishful thinking that a transaction will occur or come to fruition does not amount to sufficient contemplation or preliminary negotiation of that transaction. To constitute specific information, **a proposal, whether described as under contemplation or at a preliminary stage of negotiation, should have more substance** than merely being at the stage of a vague exchange of ideas or a "fishing expedition". Where negotiations or contacts have occurred, for these to be considered specific information **there should be a substantial commercial reality to such negotiations which goes beyond a merely exploratory testing of the waters and which is at a more concrete stage where the parties intend to negotiate with a realistic view to achieving an identifiable goal**."

"Corporations with potential inside information need to assess promptly whether or not the information is likely to have a material price effect. It would not be sufficient to meet the test of "likely to have a material price effect" if the information is likely to cause a mere fluctuation or slight change in price. For information to constitute inside information, **there must be likelihood that the information would cause a change in the price of sufficient degree to amount to a material change**. Information that is likely materially to affect the price is information which **may well materially affect the price**. Put another way, it is more likely than less likely that the price will be affected materially. The further element of the statutory test concerns **materiality**.

**The standard by which materiality is to be judged is whether the information on the particular share is such as would influence persons who are accustomed or would be likely to deal in the share, in deciding whether or not to buy or whether or not to sell that share.**

The test of whether the information is likely to materially affect the price is a hypothetical one in that it has to be applied at the time the information becomes available."

In determining whether a material effect is likely to occur, the following factors should be taken into consideration – (a) the anticipated **magnitude** of the event or the set of circumstances in question in the context of the **totality** of the corporation's activity; (b) the relevance of the information as regards the main determinants of the price of the listed securities; (c) the reliability of the source; (d) market variables that affect the price of the listed securities in question (These variables could include prices, returns, volatilities, liquidity, price relationships among securities, volume, supply, demand, etc.)."

"[T]he corporation should immediately take all steps that are necessary in the circumstances to disclose the information to the public. For example, if a corporation faces an event that might significantly affect its business and operations, the necessary steps which the corporation should immediately take prior to the issue of a public announcement may include **ascertaining sufficient details, internal assessment of the matter and its likely impact, seeking professional advice** where required and verification of the facts."
(emphasis added).

97.     The Guidelines also provides that ~~registration statements such as the one filed by Canaan on Form F-1~~ "[t]he information contained in an announcement must not be false or misleading as to a material fact, or false or misleading through the omission of a material fact. To comply with ~~the other requirements~~ this requirement, the information must be accurate and complete in all material respects and not be misleading or deceptive, and there are no omissions that would make the information misleading."

98.     According to the Rules Governing the Listing of Securities on the Stock Exchange of Hong Kong Limited, inside information must be published on the HKEX website. (Listing Rule 14.09(2)(a)).

99.     On October 28, 2019, Grandshores published on the HKEX website as material inside information that it had entered into the Cooperation Agreement with Canaan, which provided that it would purchase up to $150 million of blockchain machines on or before December 31, 2020. Grandshores thereby represented that the Cooperation Agreement was material and had commercial substance.

100.    Grandshores's shareholders agreed that the Cooperation Agreement was material. On October 28, 2019, Grandshores' stock price opened 65.1% higher than they had closed the previous day. That day, they closed 18.6% higher, on unusually high volume.

The Cooperation Agreement Was Material to Canaan

101.    The Cooperation Agreement was material to Canaan, too.

102.    On October 17, 2019, one month before Canaan's IPO, Canaan's Sales Director Feng Chen stated on a live broadcast promoting Canaan's latest Bitcoin mining machines that "recently we received letters of intent for over ten thousand units, multiple ten thousand units, even one hundred thousand units, all in discussion." [39] He added that:

> [C]urrently we have received orders for up to January of the next year. We have received orders for nearly 500,000 units for Series A10 and A11. This is a quite enormous number. This proves that more and more institutional large funds haven entered the mining business. This is a good thing to the mining business. We expect nearly 1 million units going out of our warehouse for 2020." [40]

103.    Commentators agreed that Canaan's letters of intent were material. The day after Mr. Chen's interview, 8btc and Bitcoin Magazine concluded that Canaan would expect more than $1 billion in sales in 2020. [41]

104.    The Cooperation Agreement was one of the chief letters of intent that Canaan had received. It would account, by itself, for 15% of Canaan's projected total sales in 2020. Canaan was required to disclose this a material agreement in the Registration Statement as a material related party transaction. Item 404; Form 20-F, Item 7.B.

---

[39] https://www.yizhibo.com/l/z9y1lNcbCKfaelLW.html, at 17:40.
[40] *Id.*, at 20:56.
[41] https://bitcoinmagazine.com/articles/canaan-expects-1-billion-plus-from-avalonminer-sales-in-2020; also https://news.8btc.com/canaan-expects-1-billion-from-avalonminer-sales-in-2020-as-buying-interest-increases

77.1.  Canaan was also required to disclose the Cooperation Agreement as a material uncertainty under Item 5(d) of Form 20-F and Item 303 of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10. Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

105.    .

78.106.        Part I, Item 5(d) of Form 20-F, in turn, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation,* Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1. Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.
79.    Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation,* Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

80.107.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations"

39

("MD&A"). In a1989Item 303 of Regulation S-K (17 CFR § 229.303). In a 1989 Interpretive

Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.
> *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[42]

81.108.        Issuers must disclose both (a) known trends and uncertainties and (b) any

potential material impact of known trends and uncertainties on their own operations even if the

trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See*

*also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

82.1.    On October 27, 2019, one day before Canaan's announcement of its planned IPO

on Nasdaq and filing of the Registration Statement, Grandshores, a HKSE-listed company

controlled by Yao, announced the Cooperation Agreement entered between one of its subsidiaries,

Hangzhou Grandshores Weicheng Technology Co., Ltd. ("Grandshores Weicheng"), and Canaan.

83.    The Cooperation Agreement stated that "GS Weicheng intend[ed] to purchase from

Canaan or distribute on behalf of Canaan blockchain equipment with an aggregate amount of not

more than USD150 million up to 31 December 2020. Canaan will provide GS Weicheng with

preferential prices and technical guidance." The potential revenue that Corporation Agreement

could bring to Canaan in the one year after the IPO nearly equaled Canaan's entire trailing twelve-

---

[42] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

month revenues of approximately US$177 million, and 38% and 73% of Canaan's total net revenues for 2018 and 2019.

109.   ~~Disclosure of the Cooperation Agreement caused Grandshores' stock price to rocket upwards 18.6% within one day of~~ The proposed transactions were uncertain because the Agreement was a non-binding framework. Yao is a leading character in the global blockchain industry and has successfully invested in a few world-leading blockchain companies. Yao has close connections with various Chinese provincial and municipal governments. He founded the Grandshores Global Blockchain Ten-Billion Innovation Fund in 2018 with RMB 10 billion (approximately US$ 1.55 billion) capital that was 30% funded by the Hangzhou municipal government and aimed to invest in blockchain businesses. The fulfilment of the Cooperation Agreement would bring revenue equal to 38% and 73% of Canaan's total net revenues for 2018 and 2019 respectively and materially impacted investors' evaluation of the Company and its stock price. If Grandshores broke the agreement or was unable to fulfil its obligations, Canaan's ADSs would be worth less.

84.   ~~However,~~ Canaan made no disclosure of this ~~announcement, showing this agreement's material impact on the value of a company involved in the~~ related party transaction~~.~~

85.   ~~Therefore, Canaan violated~~ in its Recitation statement under Item 5(d) and Item 303 ~~for its failure to disclose and discuss the Cooperation Agreement in the Registration Statement, which was reasonably likely to have a material effect on the company's net sales or revenues, or that would cause reported financial~~. Canaan explicitly disavowed incorporation of any information ~~not necessarily to be indicative of future operating results or financial condition.~~

86.   ~~Also, as stated above, under SEC regulations, Canaan must disclose "[t]he nature and extent of any *presently proposed transactions* which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services,~~

41

or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party."outside Form 20-F, Item 7.B.1. Canaan violated such SEC regulation for failure to disclose the Cooperation Agreement given Yao's status as a related party of Canaan.

87.    Furthermore, Canaan's Code of Business Conduct and Ethics ("Code of Ethics"), which Canaan filed as part of the Registration Statement, required that its employees avoid conflicts of interest arising from being concurrently employed by, serve as a director of, trustee for or provide any services not in his or her capacity as an employee to any entity, whether for-profit or non-profit, that is a material customer, financial institution, service provider, supplier or competitor of the Company or any entity whose interests would reasonably be expected to conflict with the Company. The Code of Ethics also provided that no employee should have a significant financial interest (ownership or otherwise) in any company that is a material customer, financial institution, service provider, supplier or competitor of the Company or any entity whose interests would reasonably be expected to conflict with the Company. The Company required that employees fully disclose any situations that could reasonably be expected to give rise to a conflict of interest.

88.    Had Defendants properly conducted due diligence during the IPO, they would have easily discovered that Yao's cotemporaneous senior positions at Canaan and Grandshores violated Canaan's Code of Ethics, and further created a significant risk of self-dealing.

## IV.4. FAILURE TO DISCLOSE 2017 ZHEJIANG SUANLI PURCHASES

89. ~~The corporate record obtained from China's National Enterprise Credit Information Publicity System~~[43] ~~(Exhibit 4) shows that Defendant Kong owns 35% of a Chinese company called Zhejiang Shubei Investment Management Co., Ltd. ("Zhejiang Shubei") and is the executive director of Zhejiang Shubei. Also, Defendant Sun owns 25% of Zhejiang Shubei and is the supervisor of Zhejiang Shubei. Together, they own 50% of Zhejiang Shubei and are the only two senior executives and officers of Zhejiang Shubei.~~

90. ~~The corporate record obtained from China's National Credit Information Disclosure System for Enterprises (Exhibit 5) shows that Zhejiang Shubei owned 10% of Zhejiang Suanli. As noted above, Zhejiang Suanli purchased RMB 973,333.33 (approximately US$149,697) of products from Canaan in January through April 2017. Canaan recognized such transactions with Zhejiang Suanli as related party transactions because Defendant Kong "owned shares of or exercised significant control over" Zhejiang Suanli.~~[44]

~~91.~~110.     ~~Canaan failed to make the required disclosure of the ownership of this Canaan customer by Defendants Kong and Sun and such 2017 transactions in~~ its Registration Statement~~, violating SEC regulations and GAAP. See Item 404 of SEC Regulation~~. [45] The disclosure by Grandshores on HKEX did not exempt Canaan's duty to disclose here in the U.S~~ K; Form 20-F, Item 7.B 1; ASC 850~~.

---

[43] ~~China's National Enterprise Credit Information Publicity System provides public access to official registration data for all legal entities in China. The registration data also contain names of key individuals such as legal representative, private shareholders and key staff defined as a board member, CEO, supervisor, general manager, and legal representative. State Administration for Market Regulation of China operates and maintains the system.~~
[44] ~~http://www.neeq.com.cn/disclosure/2017/2017-08-30/1504079249_162780.pdf, at p89.~~

43

## V.    AN ANALYST FIRM REVEALS THE TRUTH, CAUSING PLAINTIFF'SPLAINTIFFS' LOSSES

92.111.         On February 20, 2020, theanalyst firm Marcus Aurelius published a report, exposing, among other things, that the problems arising from the related party transactions between Canaan, Yao and Grandshores, and their Cooperation Agreement was a related party transaction. .[46] The Marcus Aurelius Report noted that Canaan's strategic partnership with Grandshores was actually a transaction with a related party, and likely a fictional one. The Marcus Aurelius Report also exposed related party transactions between Canaan and Defendants Kong and Sun.. Following the Marcus Aurelius Report, Canaan ADSs fell $0.39 per ADS, or over 6.8%, to close at $5.32 per ADSs on February 20, 2020, damaging investors.

112.    On April 6, 2020, a securities analyst firm Standard and Consensus Rating published a 13-page research report entitled "Canaan ADSs now trade far belowStudy Report – Industry Research Report",  rating Canaan's stock as "Sell" and listing the IPO price. Byfailure to disclose that the timeCooperation Agreement was a related party transaction in the SEC filings as one of the three factors that supported the sell rating.

93.113.         When this action was filed, Canaan's stock price losthad fallen 48% of its value from theits IPO price. ByAs the date thisFirst Amended Complaint is filed, Canaan's stock price losthad fallen 79% of its value from theits IPO price. As a result of Defendants' wrongful

---

[46] http://www.mavalue.org/research/canaan-fodder/?__cf_chl_jschl_tk__=a7729189434f25bd77db160bf3d09d771043d3fa-1601506593-0-AeDXbA9RI6Nnmzi3LCBR17ioyDtOavagefgpeZeg7j6CX1FHmurZuqaT8S5Q57QDdmQQu8ftOtVYMwrbYen1Gsb7EYoIdvfoxsRT1cUX6Y_fBSB2jLU39ICBQdcquOW61tnOMD_dX7e4q0_vx6jwpu2i6vvm5s-D6bfFa8QYP3gXw4VxznOdFVvwzc5Gk4kEllq93ej18v5Ck2bwiK02mtC-gfgxvIfJzARTeaMXVTyV0GV3AIPDYy3iJ1mJGsSt266ivzM4_6cJa2wOHuTDue6PYhXeVKpEbmDrtGzPlbn8 http://www.mavalue.org/research/canaan-fodder/

acts and omissions, and the decline in the market value of the Company's ADSs, ~~Plaintiff~~Plaintiffs

and other Class members have suffered significant losses and damages.

## VI.    <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

~~94.~~114.         Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who

purchased or otherwise acquired Canaan ADSs in its IPO or purchased Canaan ADSs thereafter in

the stock market pursuant and/or traceable to the Company's Registration Statement issued in

connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the

officers and directors of the Company, members of the Individual Defendants' immediate families

and the Individual Defendants' legal representatives, heirs, successors or assigns and any entity in

which the officers and directors of the Company have or had a controlling interest.

~~95.~~115.         The members of the Class are so numerous that joinder of all members is

impracticable. Since the IPO, the Company's securities have actively traded on Nasdaq. While the

exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only

through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of

members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by Canaan or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class

actions.

~~96.~~116.         Plaintiffs' claims are typical of the claims of the members of the Class as

all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

97.117.       Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

98.118.       The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

99.119.       Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the Securities Act was violated by Defendants as alleged herein;

b.  whether the Registration Statement were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein; and

c.  the extent to which members of the Class have sustained damages and the proper measure of damages.

100.120.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.   SECURITIES ACT CLAIMS

### COUNT I

#### Violation of Section 11 of the Securities Act

#### Against All Defendants

101.121.      Plaintiffs repeat and re-allege the allegations set forth in ¶¶-1-100120, as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct in connection with the Securities Act claims.

102.122.      This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

103.123.      The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

104.124.      Canaan is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

105.125.      Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

106.126.      None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

107.127.      By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

108.128.      Plaintiffs acquired Canaan's ADSs pursuant and/or traceable to the Registration Statement.

47

109.129.    At the time of their purchases of Canaan securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

110.130.    Plaintiffs and the Class have sustained damages. The value of Canaan ADSs has declined substantially subsequent to and due to Defendants' violations.

111.131.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## COUNT II

### Violation of Section 15 of The Securities Act

### Against Individual Defendants

112.132.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶-1-111131, as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct as to the Securities Act claims.

113.133.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and is based upon Section 15 of the Securities Act.

114.134.    The Individual Defendants were each control persons of Canaan by virtue of their positions as directors, senior officers, major shareholders and/or authorized representatives of Canaan. Individual Defendants had the power and influence and exercised the same to cause Canaan to engage in the acts described herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Canaan.

48

115.135.    Canaan and the Individual Defendants were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

116.136.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## VIII.    EXCHANGE ACT CLAIMS
### COUNT III
**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against Canaan and Individual Defendants**

117.137.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-100120, as if fully set forth herein. This Count is asserted against Canaan and Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

118.138.    Canaan is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

119.139.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Canaan under *respondeat superior* and agency principles.

49

**Additional Allegations Supporting Scienter**

140.    Transactions with related parties and/or sham entities have been a hallmark of fraudulent US-listed Chinese companies. The companies use these transactions to artificially inflate revenues or otherwise falsify their financials.

141.    As the Marcus Aurelius Report noted, Canaan used the Grandshores letter of intent to support its stock price. Marcus Aurelius suspected that it, and other letters of intent, were "largely bogus".

142.    On October 27, 2019, the same day of signing the Cooperation Agreement with Grandshores and one day before Canaan's announcement of its planned IPO on Nasdaq, Canaan also entered into a strategic cooperation agreement with Zhejiang Jingu Co. Ltd. ("Jingu"), a Chinese company listed on the Shenzhen Stock Exchange in China ("Jingu Agreement"). Jingu principally engages in manufacturing and distributing automotive wheels and tires in China. The Jingu Agreement stated that Canaan and Jingu would establish a joint venture which uses blockchain technology to trace auto parts through repair and maintenance records.

143.    Jingu disclosed this transaction pursuant to China's securities regulation on October 28, 2019, which immediately caused Jingu's stock price to jump up and triggered the intraday 10% upper price limit the same day.[47]

144.    From October 28, 2019 to November 5, 2019, Jingu stock price had risen by over 18% compared to the close price of October 25, 2019, the trade day before the disclosure, with unusually high daily trading volumes.

---

[47] To regulate irregular market volatility and price fluctuation, China's equity market imposes daily price up and down limits of 10% on regular stocks. When a stock's price moves up or down by 10% against the close price on the previous trade day intraday on a certain trade day, trading is only allowed for transaction prices within the upper and lower 10% limits during that day.

145.   The joint venture between a blockchain company and an automotive wheels and tires manufacturer was so unusual that it immediately drew the Shenzhen Stock Exchange's attention. On October 29, 2019, Shenzhen Stock Exchange issued a letter to Jingu, ordering it to explain, among others, the validity of this transaction. In response, Jingu disclosed that its CEO was a long-term close friend of Canaan Co-CEO and Director, Defendant Jianping Kong.

146.   Some analysts believed that Canaan's cooperation with Grandshores and Jingu reflected endorsements from listed companies, was conducive to expanding Canaan's influence on the market, and raised Canaan's IPO price valuation.[48]

<div align="center">

**Applicability of Presumption of Reliance:**
*Affiliated Ute*

</div>

120.147.   The statements made by Canaan and the Individual Defendants during the Class Period were misleading for omitting to disclose information concerning the on-going investigation which rendered statements in the Registration Statement and 2018 20-F misleading.

121.148.   Neither plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that Canaan withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

---

[48] https://www.jinse.com/news/blockchain/504571.html, last viewed on August 6, 2021.

**Application of Presumption of Reliance:**
**Fraud on the Market**

122.149.      Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Canaan and the Individual Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Canaan securities were traded in efficient markets during the Class Period.

123.150.      Canaan's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on Nasdaq; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) During the Class Period, Canaan was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were widely distributed and publicly available; (iv) Canaan met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (v) Canaan timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (vi) Canaan regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vii) the price of Canaan securities responded quickly to incorporate and reflect new public information concerning Canaan during the Class Period; (viii) more than ten market makers made a market in Canaan ADSs during the Class Period.

124.151.      During the Class Period, Canaan and Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly

52

engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Canaan securities; and (iii) cause Plaintiffs and other members of the Class to purchase Canaan securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Canaan and Individual Defendants, and each of them, took the actions set forth herein.

125.152.      Pursuant to the above plan, scheme, conspiracy and course of conduct, Canaan and each of the Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Canaan securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Canaan's finances and business prospects.

126.153.      By virtue of their positions at Canaan, Canaan and Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Canaan and Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false

53

and misleading nature of the statements made, although such facts were readily available to Canaan and Individual Defendants. Said acts and omissions of Canaan and Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

127.154.    Information showing that Canaan and Individual Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of Canaan and Individual Defendants. As the senior managers and/or directors of Canaan, the Individual Defendants had knowledge of the details of Canaan internal affairs.

128.155.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Canaan. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Canaan's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of Canaan securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Canaan's business and financial condition which were concealed by Canaan and Individual Defendants, Plaintiffs and the other members of the Class purchased Canaan securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Canaan and Individual Defendants, and were damaged thereby.

129.156.    During the Class Period, Canaan ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and

54

misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Canaan securities at prices artificially inflated by the wrongful conduct of Canaan and Individual Defendants. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Canaan securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Canaan securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

157.     By reason of the conduct alleged herein, Canaan and Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

158.     As a direct and proximate result of the wrongful conduct of Canaan and Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

159.     This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

**COUNT IV**

**For Violations of §20(a) of the Exchange Act**

**Against Individual Defendants**

133.160.	Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-100, 117-132120, 137-159, as if fully set forth herein.

134.161.	During the Class Period, the Individual Defendants participated in the operation and management of Canaan, and conducted and participated, directly and indirectly, in the conduct of Canaan's business affairs. Because of their senior and controlling positions, they knew the adverse non-public information about Canaan.

135.162.	As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Canaan's financial condition and results of operations, and to correct promptly any public statements issued by Canaan's which had become materially false or misleading.

136.163.	Because of their positions of control and authority as senior officers and/or controlling shareholders, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Canaan disseminated in the marketplace during the Class Period concerning Canaan's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Canaan to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Canaan within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Canaan securities.

137.164.     Each of the Individual Defendants, therefore, acted as a controlling person of Canaan. By reason of their senior management positions, being directors, and/or controlling shareholders of Canaan, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Canaan to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Canaan and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

138.165.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Canaan.

139.166.     This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

## IX.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: ~~October 7, 2020~~August 6, 2021

<div style="margin-left:50%">

Respectfully submitted,

/s/Laurence M. Rosen
**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Jing Chen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        jchen@rosenlegal.com

*Counsel for Lead Plaintiffs*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October 2020, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen

Laurence Rosen

59